(Slip Opinion)     OCTOBER TERM, 2005      1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BRIGHAM CITY, UTAH *v.* STUART ET AL.

CERTIORARI TO THE SUPREME COURT OF UTAH

No. 05–502.   Argued April 24, 2006—Decided May 22, 2006

Responding to a 3 a.m. call about a loud party, police arrived at the
house in question, heard shouting inside, proceeded down the drive-
way, and saw two juveniles drinking beer in the backyard.  Entering
the yard, they saw through a screen door and windows an altercation
in the kitchen between four adults and a juvenile, who punched one
of the adults, causing him to spit blood in a sink.  An officer opened
the screen door and announced the officers' presence.  Unnoticed
amid the tumult, the officer entered the kitchen and again cried out,
whereupon the altercation gradually subsided.  The officers arrested
respondents and charged them with contributing to the delinquency
of a minor and related offenses.  The trial court granted their motion
to suppress all evidence obtained after the officers entered the home
on the ground that the warrantless entry violated the Fourth
Amendment, and the Utah Court of Appeals affirmed.  Affirming, the
State Supreme Court held that the injury caused by the juvenile's
punch was insufficient to trigger the "emergency aid doctrine" be-
cause it did not give rise to an objectively reasonable belief that an
unconscious, semiconscious, or missing person feared injured or dead
was in the home.  Furthermore, the court suggested the doctrine was
inapplicable because the officers had not sought to assist the injured
adult but had acted exclusively in a law enforcement capacity.  The
court also held that the entry did not fall within the exigent circum-
stances exception to the warrant requirement.

*Held:* Police may enter a home without a warrant when they have an
objectively reasonable basis for believing that an occupant is seri-
ously injured or imminently threatened with such injury.

   Because the Fourth Amendment's ultimate touchstone is "reason-
ableness," the warrant requirement is subject to certain exceptions.
For example, one exigency obviating the requirement is the need to

Syllabus

render emergency assistance to occupants of private property who are seriously injured or threatened with such injury. *Mincey* v. *Arizona*, 437 U. S. 385, 392. This Court has repeatedly rejected respondents' contention that, in assessing the reasonableness of an entry, consideration should be given to the subjective motivations of individual officers. Because the officers' subjective motivation is irrelevant, *Bond* v. *United States,* 529 U. S. 334, 338, n. 2, it does not matter here whether they entered the kitchen to arrest respondents and gather evidence or to assist the injured and prevent further violence. *Indianapolis* v. *Edmond*, 531 U. S. 32, 46, and *Florida* v. *Wells,* 495 U. S. 1, 4, distinguished. Relying on this Court's holding in *Welsh* v. *Wisconsin*, 466 U. S. 740, 753, that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made," respondents further contend that their conduct was not serious enough to justify the officers' intrusion into the home. This contention is misplaced. In *Welsh*, the "only potential emergency" confronting the officers was the need to preserve evidence of the suspect's blood-alcohol level, an exigency the Court held insufficient under the circumstances to justify a warrantless entry into the suspect's home. *Ibid.* Here, the officers were confronted with *ongoing* violence occurring *within* the home, a situation *Welsh* did not address.

The officers' entry here was plainly reasonable under the circumstances. Given the tumult at the house when they arrived, it was obvious that knocking on the front door would have been futile. Moreover, in light of the fracas they observed in the kitchen, the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence was just beginning. Nothing in the Fourth Amendment required them to wait until another blow rendered someone unconscious, semiconscious, or worse before entering. The manner of their entry was also reasonable, since nobody heard the first announcement of their presence, and it was only after the announcing officer stepped into the kitchen and announced himself again that the tumult subsided. That announcement was at least equivalent to a knock on the screen door and, under the circumstances, there was no violation of the Fourth Amendment's knock-and-announce rule. Furthermore, once the announcement was made, the officers were free to enter; it would serve no purpose to make them stand dumbly at the door awaiting a response while those within brawled on, oblivious to their presence. Pp. 3–7.

2005 UT 13, 122 P. 3d 506, reversed and remanded.

ROBERTS, C. J., delivered the opinion for a unanimous Court. STEVENS, J., filed a concurring opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

No. 05–502

---

## BRIGHAM CITY, UTAH, PETITIONER *v.* CHARLES W. STUART ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF UTAH

[May 22, 2006]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

In this case we consider whether police may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury. We conclude that they may.

I

This case arises out of a melee that occurred in a Brigham City, Utah, home in the early morning hours of July 23, 2000. At about 3 a.m., four police officers responded to a call regarding a loud party at a residence. Upon arriving at the house, they heard shouting from inside, and proceeded down the driveway to investigate. There, they observed two juveniles drinking beer in the backyard. They entered the backyard, and saw—through a screen door and windows—an altercation taking place in the kitchen of the home. According to the testimony of one of the officers, four adults were attempting, with some difficulty, to restrain a juvenile. The juvenile eventually "broke free, swung a fist and struck one of the adults in the face." 2005 UT 13, ¶2, 122 P. 3d 506, 508. The officer

testified that he observed the victim of the blow spitting blood into a nearby sink. App. 40. The other adults continued to try to restrain the juvenile, pressing him up against a refrigerator with such force that the refrigerator began moving across the floor. At this point, an officer opened the screen door and announced the officers' presence. Amid the tumult, nobody noticed. The officer entered the kitchen and again cried out, and as the occupants slowly became aware that the police were on the scene, the altercation ceased.

The officers subsequently arrested respondents and charged them with contributing to the delinquency of a minor, disorderly conduct, and intoxication. In the trial court, respondents filed a motion to suppress all evidence obtained after the officers entered the home, arguing that the warrantless entry violated the Fourth Amendment. The court granted the motion, and the Utah Court of Appeals affirmed.

Before the Supreme Court of Utah, Brigham City argued that although the officers lacked a warrant, their entry was nevertheless reasonable on either of two grounds. The court rejected both contentions and, over two dissenters, affirmed. First, the court held that the injury caused by the juvenile's punch was insufficient to trigger the so-called "emergency aid doctrine" because it did not give rise to an "objectively reasonable belief that an unconscious, semi-conscious, or missing person feared injured or dead [was] in the home." 122 P. 3d, at 513 (internal quotation marks omitted). Furthermore, the court suggested that the doctrine was inapplicable because the officers had not sought to assist the injured adult, but instead had acted "exclusively in their law enforcement capacity." *Ibid.*

The court also held that the entry did not fall within the exigent circumstances exception to the warrant requirement. This exception applies, the court explained, where

police have probable cause and where "a reasonable person [would] believe that the entry was necessary to prevent physical harm to the officers or other persons." *Id.,* at 514 (internal quotation marks omitted). Under this standard, the court stated, the potential harm need not be as serious as that required to invoke the emergency aid exception. Although it found the case "a close and difficult call," the court nevertheless concluded that the officers' entry was not justified by exigent circumstances. *Id.,* at 515.

We granted certiorari, 546 U. S. \_\_\_ (2006), in light of differences among state courts and the Courts of Appeals concerning the appropriate Fourth Amendment standard governing warrantless entry by law enforcement in an emergency situation. Compare *In re Sealed Case 96–3167,* 153 F. 3d 759, 766 (CADC 1998) ("[T]he standard for exigent circumstances is an objective one") and *People* v. *Hebert,* 46 P. 3d 473, 480 (Colo. 2002) (en banc) (considering the circumstances as they "would have been objectively examined by a prudent and trained police officer"), with *United States* v. *Cervantes*, 219 F. 3d 882, 890 (CA9 2000) ("[U]nder the emergency doctrine, '[a] search must not be primarily motivated by intent to arrest and seize evidence'" (quoting *People* v. *Mitchell*, 39 N. Y. 2d 173, 177, 347 N. E. 2d 607, 609 (1976)) and *State* v. *Mountford,* 171 Vt. 487, 492, 769 A. 2d 639, 645 (2000) (*Mitchell* test "requir[es] courts to find that the primary subjective motivation behind such searches was to provide emergency aid").

## II

It is a "'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Groh* v. *Ramirez,* 540 U. S. 551, 559 (2004) (quoting *Payton* v. *New York,* 445 U. S. 573, 586 (1980) (some internal quotation marks omitted)).

Nevertheless, because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions. *Flippo* v. *West Virginia,* 528 U. S. 11, 13 (1999) *(per curiam); Katz* v. *United States,* 389 U. S. 347, 357 (1967). We have held, for example, that law enforcement officers may make a warrantless entry onto private property to fight a fire and investigate its cause, *Michigan* v. *Tyler,* 436 U. S. 499, 509 (1978), to prevent the imminent destruction of evidence, *Ker* v. *California,* 374 U. S. 23, 40 (1963), or to engage in "hot pursuit" of a fleeing suspect, *United States* v. *Santana,* 427 U. S. 38, 42–43 (1976). "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey* v. *Arizona,* 437 U. S. 385, 393–394 (1978).

One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. "'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *Id.,* at 392 (quoting *Wayne* v. *United States*, 318 F. 2d 205, 212 (CADC 1963) (Burger, J.)); see also *Tyler, supra,* at 509. Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. *Mincey, supra,* at 392; see also *Georgia* v. *Randolph,* 547 U. S. ___, ___ (2006) (slip op., at 13–14) ("[I]t would be silly to suggest that the police would commit a tort by entering . . . to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur").

Respondents do not take issue with these principles, but instead advance two reasons why the officers' entry here was unreasonable. First, they argue that the officers were

more interested in making arrests than quelling violence.
They urge us to consider, in assessing the reasonableness
of the entry, whether the officers were "indeed motivated
primarily by a desire to save lives and property." Brief for
Respondents 3; see also Brief for National Association of
Criminal Defense Lawyers as *Amicus Curiae* 6 (entry to
render emergency assistance justifies a search "only when
the searching officer is acting outside his traditional law-
enforcement capacity"). The Utah Supreme Court also
considered the officers' subjective motivations relevant.
See 122 P. 3d, at 513 (search under the "emergency aid
doctrine" may not be "primarily motivated by intent to
arrest and seize evidence" (internal quotation marks
omitted)).

Our cases have repeatedly rejected this approach. An
action is "reasonable" under the Fourth Amendment,
regardless of the individual officer's state of mind, "as long
as the circumstances, viewed *objectively*, justify [the]
action." *Scott* v. *United States,* 436 U. S. 128, 138 (1978)
(emphasis added). The officer's subjective motivation is
irrelevant. See *Bond* v. *United States,* 529 U. S. 334, 338,
n. 2 (2000) ("The parties properly agree that the subjective
intent of the law enforcement officer is irrelevant in deter-
mining whether that officer's actions violate the Fourth
Amendment . . . ; the issue is not his state of mind, but the
objective effect of his actions"); *Whren* v. *United States,* 517
U. S. 806, 813 (1996) ("[W]e have been unwilling to enter-
tain Fourth Amendment challenges based on the actual
motivations of individual officers"); *Graham* v. *Connor,* 490
U. S. 386, 397 (1989) ("[O]ur prior cases make clear" that
"the subjective motivations of the individual officers . . .
ha[ve] no bearing on whether a particular seizure is 'unrea-
sonable' under the Fourth Amendment"). It therefore does
not matter here—even if their subjective motives could be
so neatly unraveled—whether the officers entered the
kitchen to arrest respondents and gather evidence against

them or to assist the injured and prevent further violence.

As respondents note, we have held in the context of programmatic searches conducted without individualized suspicion—such as checkpoints to combat drunk driving or drug trafficking—that "an inquiry into *programmatic* purpose" is sometimes appropriate. *Indianapolis* v. *Edmond,* 531 U. S. 32, 46 (2000) (emphasis added); see also *Florida* v. *Wells,* 495 U. S. 1, 4 (1990) (an inventory search must be regulated by "standardized criteria" or "established routine" so as not to "be a ruse for a general rummaging in order to discover incriminating evidence"). But this inquiry is directed at ensuring that the purpose behind the *program* is not "ultimately indistinguishable from the general interest in crime control." *Edmond,* 531 U. S., at 44. It has nothing to do with discerning what is in the mind of the individual officer conducting the search. *Id.,* at 48.

Respondents further contend that their conduct was not serious enough to justify the officers' intrusion into the home. They rely on *Welsh* v. *Wisconsin,* 466 U. S. 740, 753 (1984), in which we held that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." This contention, too, is misplaced. *Welsh* involved a warrantless entry by officers to arrest a suspect for driving while intoxicated. There, the "only potential emergency" confronting the officers was the need to preserve evidence (*i.e.*, the suspect's blood-alcohol level)—an exigency that we held insufficient under the circumstances to justify entry into the suspect's home. *Ibid.* Here, the officers were confronted with *ongoing* violence occurring *within* the home. *Welsh* did not address such a situation.

We think the officers' entry here was plainly reasonable under the circumstances. The officers were responding, at 3 o'clock in the morning, to complaints about a loud party. As they approached the house, they could hear from

within "an altercation occurring, some kind of a fight." App. 29. "It was loud and it was tumultuous." *Id.,* at 33. The officers heard "thumping and crashing" and people yelling "stop, stop" and "get off me." *Id.,* at 28, 29. As the trial court found, "it was obvious that . . . knocking on the front door" would have been futile. *Id.,* at 92. The noise seemed to be coming from the back of the house; after looking in the front window and seeing nothing, the officers proceeded around back to investigate further. They found two juveniles drinking beer in the backyard. From there, they could see that a fracas was taking place inside the kitchen. A juvenile, fists clenched, was being held back by several adults. As the officers watch, he breaks free and strikes one of the adults in the face, sending the adult to the sink spitting blood.

In these circumstances, the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning. Nothing in the Fourth Amendment required them to wait until another blow rendered someone "unconscious" or "semi-conscious" or worse before entering. The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties; an officer is not like a boxing (or hockey) referee, poised to stop a bout only if it becomes too one-sided.

The manner of the officers' entry was also reasonable. After witnessing the punch, one of the officers opened the screen door and "yelled in police." *Id.,* at 40. When nobody heard him, he stepped into the kitchen and announced himself again. Only then did the tumult subside. The officer's announcement of his presence was at least equivalent to a knock on the screen door. Indeed, it was probably the only option that had even a chance of rising above the din. Under these circumstances, there was no violation of the Fourth Amendment's knock-and-announce rule. Furthermore, once the announcement was made, the

officers were free to enter; it would serve no purpose to require them to stand dumbly at the door awaiting a response while those within brawled on, oblivious to their presence.

Accordingly, we reverse the judgment of the Supreme Court of Utah, and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

––––––––––

No. 05–502

––––––––––

## BRIGHAM CITY, UTAH, PETITIONER *v.* CHARLES W. STUART ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF UTAH

[May 22, 2006]

JUSTICE STEVENS, concurring.

This is an odd flyspeck of a case. The charges that have been pending against respondents for the past six years are minor offenses—intoxication, contributing to the delinquency of a minor, and disorderly conduct—two of which could have been proved by evidence that was gathered by the responding officers before they entered the home. The maximum punishment for these crimes ranges between 90 days and 6 months in jail. And the Court's unanimous opinion restating well-settled rules of federal law is so clearly persuasive that it is hard to imagine the outcome was ever in doubt.

Under these circumstances, the only difficult question is which of the following is the most peculiar: (1) that the Utah trial judge, the intermediate state appellate court, and the Utah Supreme Court all found a Fourth Amendment violation on these facts; (2) that the prosecution chose to pursue this matter all the way to the United States Supreme Court; or (3) that this Court voted to grant the petition for a writ of certiorari.

A possible explanation for the first is that the suppression ruling was correct as a matter of Utah law, and neither trial counsel nor the trial judge bothered to identify the Utah Constitution as an independent basis for the decision because they did not expect the prosecution to

appeal.* The most plausible explanation for the latter two decisions is that they were made so police officers in Utah may enter a home without a warrant when they see ongoing violence—we are, of course, reversing the Utah Supreme Court's conclusion to the contrary. But that purpose, laudable though it may be, cannot be achieved in this case. Our holding today addresses only the limitations placed by the Federal Constitution on the search at issue; we have no authority to decide whether the police in this case violated the Utah Constitution.

The Utah Supreme Court, however, has made clear that the Utah Constitution provides greater protection to the privacy of the home than does the Fourth Amendment. See *State* v. *Debooy*, 2000 UT 32, ¶12, 996 P. 2d 546, 549. And it complained in this case of respondents' failure to raise or adequately brief a state constitutional challenge, thus preventing the state courts from deciding the case on anything other than Fourth Amendment grounds. See 2005 UT 13, ¶12, 122 P. 3d 506, 510. "[S]urpris[ed]" by "[t]he reluctance of litigants to take up and develop a state constitutional analysis," *ibid.*, the court expressly invited future litigants to bring challenges under the Utah Constitution to enable it to fulfill its "responsibility as guardians of the individual liberty of our citizens" and "undertak[e] a principled exploration of the interplay between federal and state protections of individual rights," *id.*, at 511. The fact that this admonishment and request came from the Utah Supreme Court in this very case not only demonstrates that the prosecution selected the wrong case for establishing the rule it wants, but indicates that the Utah Supreme Court would probably adopt the same rule as a matter of state constitutional law that we reject today under the

---

*Indeed, it was the prosecution that prepared the trial court's order granting respondents' motion to suppress. See 2002 UT App. 317, ¶4, 57 P. 3d 1111, 1112.

Federal Constitution.

Whether or not that forecast is accurate, I can see no reason for this Court to cause the Utah courts to redecide the question as a matter of state law. Federal interests are not offended when a single State elects to provide greater protection for its citizens than the Federal Constitution requires. Indeed, I continue to believe "that a policy of judicial restraint—one that allows other decisional bodies to have the last word in legal interpretation until it is truly necessary for this Court to intervene—enables this Court to make its most effective contribution to our federal system of government." *Michigan* v. *Long,* 463 U. S. 1032, 1067 (1983) (STEVENS, J., dissenting). Thus, while I join the Court's opinion, I remain persuaded that my vote to deny the State's petition for certiorari was correct.